May it please the Court, Jewel Hargill-Rhode here for Petitioner Chabot-Las Positas Community College District. I'd like to reserve four minutes. Before the Court is the statutory question of whether the respondent, EPA, may, as a matter of law, issue a PSD permit under Section 165 of the Clean Air Act, 40 U.S.C. 7475, to construct a major stationary source of pollution when the project will cause and contribute to the violation of the NAC, the National Ambient Air Quality Standard, of a regulated pollutant. Under both Section 165 of the Clean Air Act and the PSD regulations, which were applicable to this application through the close of the comment period, as a matter of law, no such project may be constructed unless attainment with the NAC may be maintained. Under the federally mandated provisions of the non-attainment state implementation plans, as a matter of law, no such project may be constructed unless it is demonstrated that the project will not interfere with the ability of the region to achieve attainment and compliance with the NAC for the regulated non-attainment pollutant, requiring that emissions are offset and mitigated. Let me just ask you a question because the regulations seem to be pretty clear. The PSD permitting program only regulates attainment. Do you agree with that? The PSD And unclassified pollutants. Isn't that correct? The PSD program generally regulates attainment. However, part of that PSD program is Section 165 Subdivision E, and that's what Alabama Power talks about and says and requires, and it's quite clear on the statute facially, that all regulated pollutants, non-attainment and attainment, must be analyzed. Because I want to make sure I understand your theory because here you also, I guess I want to find out, do you agree that there was a reclassification of the 24-hour PMs, right, as non-attainment, correct? And it seems like that would go to another permitting process. Well, and I'm trying to figure out why you're still focused on this PSD permitting process when it seems clear that after it was reclassified as non-attainment, it would have gone through another process. And I want to make sure I understand your theory. The point is, is that you have both, a project can have both pollutants, emit pollutants which are in attainment and in non-attainment. And so what you have, though, is an issuance of a PSD permit. So under the federally mandated provisions of the non-attainment state implementation plans, as a matter of law, this project or no such project may be constructed unless it is demonstrated that the project will not interfere with the ability of the region to achieve attainment and compliance with the NAC for the regulated non-attainment pollutant. And here the situation. And that's a separate permitting process. But here the situation is this, is that the region was in attainment. There was a comment period, the application was circulated, and there was an analysis under the PSD regulations in 2009. At the conclusion of the public comment period, it still was in attainment. So it continued to be in attainment, and it wasn't until months later after the close of the public comment period did it then become non-attainment, did PM 2.5. But it is non-attainment. It looks like you rely on a number of rules and regulations that pertain to NSR requirements, but this appeal concerns only the issue of the PSD permit. So I'm trying to figure out how your NSR-based arguments are relevant, such as the construction moratorium. Well, what happened was the PSD permit was issued during a gap period, during a time when the PSD regulations would no longer apply to PM 2.5, but the state had three years to develop a non-attainment state implementation plan. And so as a result, you have an issuance of a permit without any mitigations or anything, which violates the NAC. So our point is, is that there's your PSD regulations in Part C of the statute, and you also have Part A. And in Part A is Section 110. And that's where the decisional law has been very clear that the EPA has a continuous duty to analyze and to regulate pollutants. Because here the position of the EPA is that even though you have a violation of the NAC, they may issue a PSD permit without any mitigations, any offsets, nothing, whereby during the application period. But the PSD permit no longer controls here. It seems like there would be a separate permitting process. It's still a PSD permit, though. It's for the source. But it's now non-attainment. That one pollutant is non-attainment. But the PSD permit is issued for a source of pollution, which emits a non-attainment pollutant. And so because of the timing of the EPA, because the EPA chose to issue the permit when PM 2.5 became non-attainment, the EPA argues nothing applies and nothing regulates. And our point is that's not correct. As a matter of law, the statute, Section 110 and Section 165E require that the EPA demonstrate how it is going to maintain and achieve the NAC and also analyze PM 2.5. Regardless of whether it's a non-attainment or attainment. And that's an important point in Alabama. In the D.C. Circuit's case in Alabama, that 165 subdivision E requires the analysis of all pollutants. And that's tracking the statute verbatim. And that's what Petitioner did not get before the EAB, was that we had challenged before the EAB the analysis by the EPA. And the EAB's response was we don't have jurisdiction due to this confusion of we only review PSD-regulated pollutants. And the statute, though, and the regulations support that you must have an analysis. And that's also in the Federal Register. And that's why we cite the Federal Register, the opinion. You make a number of claims, so I want to make sure I ask you about them. The PSD permit and any obligations EPA has under the, I guess, CSMA or ESA, the Coastal. Oh, the Coastal Zone Management Act. Yes. Or ESA appear to be separate legal requirements. So I'm trying to figure out why then do we have jurisdiction over the Coastal Zone Management Act and ESA claims because it seems like those need to be brought first at the district court and it doesn't appear that they were. Well, no. They're tied to the regulatory structure of issuing a PSD permit. But the district court hasn't ruled on that. I mean, not district court, but that has not been ruled on before. You don't need to go to the district court because under the regulations, the PSD regulations, a condition of issuing a PSD permit, if the project, the site, is in the Coastal Zone, there must be a certification that the project is consistent with the Coastal Zone Management Act. And that's the point, is if the project. Let me ask it different. Maybe you're answering it, but what gives us the authority to hear these claims which, I guess, related to the PSD permit along with the appeal of the PSD permit? I mean, because that's what's being appealed here. Your Honor, I think that we have outlined, we outlined that in our brief. We've got that. There is the regulation that specifically ties the issuance of a PSD permit to certification. Because the way the regulation is written is that if you have a project located within the Coastal Zone, then as a condition of issuing a PSD permit, the EPA, there must be a certification of consistency that the project is consistent with the Coastal Zone Management Act or the local agency here, the San Francisco Bay Plan. And once the EPA has that consistency certification, then it is authorized to issue the PSD permit because that's the point there. I mean, with respect to the Coastal Zone, isn't there a question of whether this is in, the RCEC is in the Coastal Zone? Well, that is one of the issues, is the definition of site. And here you have a project that is so big that the turbines are located next to the wetlands adjacent and where the Coastal Zone, California Coastal Zone line goes, and its transmission towers and transmission lines are located within the bay, the wetlands, and the water. So you have a very large project, which is the associated facilities, as they are defined in the regulations, are undisputedly in the wetlands, in the bay, and in the Coastal Zone. And the turbines, which generate the electricity for the transmission lines, is located basically across the street. And what specific injury has your client suffered? Oh, I think as outlined by the Chancellor's declaration, it's substantial. This community college district has spent almost $200 million of taxpayer Measure B money to improve its campus, which is very close to this project, almost 100 acres. They have a substantial financial investment in this campus, which is just a mile next to RCEC, the turbines, where the turbines are emitted, and as the EPA admits, the significant impact radius is six miles. And there are thousands of sensitive receptors. And so they've already had a problem on retaining faculty and attracting students, because that's how they operate. They depend upon enrollment and also attracting faculty. And that's outlined in the Chancellor's declaration, where already they've had potential candidates say, I don't think I want to work here next to this power plant. Let me ask you then, the claims you make under the ESA and the CSMA, I'm calling it CSMA, the CCMA, seem like they allege procedural injuries. Are you alleging procedural injury here? Well, we're alleging that we did not receive a hearing or notice, because under the Coastal Zone Management Act, when a project site is in the coastal zone as it is here, the associated facilities, as a matter of law, the agency here, the Bay Area Air Quality Management District, or no, sorry, the BCDC, Bay Area Conservation Development Commission, sorry, must notice the public and hold a hearing. Well, how is the, I guess, the Section 7 consultation and consistency review meant to protect your client's concrete interest, which I think has to be shown here? I'm just trying to figure out if the college district have either an economic or a propriety interest in the endangered species or the coastline. Well, the coastline is within the jurisdiction of a college district, and that is attachment A to the Chancellor's Declaration on the boundaries. When you say within the jurisdiction? Well, the jurisdiction of the community college districts. All the college districts have boundaries and encompass cities and portions of counties and areas, physical distinct areas, which part of that includes the coastal zone for this college district. And here is the health of the community, and oftentimes the health, the ecological health of the coastline is reflective, too, to the health of the community. Doesn't the Army Corps Section 7 consultation regarding the PG&E address your concerns? Absolutely not, Your Honor, because they have not, that is an analysis which doesn't take into consideration the project of a whole. It doesn't acknowledge the existence of the turbines or 2 million tons of CO2 a year. This is going to be the second biggest power plant in the nine Bay Area counties, six overall including the refineries. It is a major industrial source of pollution. Well, let's say we got the relief you request under the ESA. How can we find right now that this relief would likely redress your injury? Oh, we have, because, well, we did attempt to offer evidence, some of the evidence that we would offer, which was the opinion of the Caltrans Aeronautics, the chief of Caltrans Aeronautics, that, in fact, in his opinion, this project, because of its size, the plume, it's 1,000 feet high, would interfere with the Hayward Executive Airports and also the Oakland Airport. And he wrote the director of BCDC stating that if the court remanded the permit back, including under the CZMA, that he would like notice and that he would like to testify because, in his opinion, this project is inconsistent with the San Francisco Bay Plan, which puts airports in a priority area. And so how would that change anything about the PSD permit? Well, because having a certification that the project is consistent is a prerequisite to issuing a PSD permit. If, in fact, BCDC agreed that this project was inconsistent with the San Francisco Bay Plan, then there would be no PSD permit. Isn't that just speculation, though? Well, Your Honor, that's one of the reasons why any ‑‑ the ability to have a public hearing is always speculation, and that's why we offered our proposed testimony to the court as to our response, that, no, this isn't speculation. We have hard evidence to present that, and, in fact, that same evidence was presented in another case before the California Energy Commission, and, in fact, they agreed with us and denied the application based on the expert testimony, both not only of the chief of Caltrans Aeronautics, which was offered, but also from the FAA. So we think that we definitely have a strong case that this is inconsistent with the San Francisco Bay Plan. And ‑‑ I think you're down to your last word. Okay. Thank you, Your Honor. I would urge the court that, as a matter of law, back to the Clean Air Act, is that this case stands for the proposition that the EPA has a continuous statutory duty, including during the gap period, before a state has an approved Part D nonattainment NSR program to require any major stationary source of pollution, such as RCEC, to show safeguards are in place and demonstrate that the new major stationary source will not interfere with the region's ability to achieve attainment under the CAA. And because this did not take place, we ask the court to remand the permit to require the EPA to perform its statutory duty and for the EAB to hear our challenge to the analysis of the 24‑hour PM 2.5 as required under Subdivision E of Section 165 and established under Alabama, and that the EPA be required to demonstrate that the project will not interfere with attainment of 24‑hour PM 2.5 as outlined in NRDC versus EPA, setting forth those required findings necessary to approve such a major project during this gap period when the PSB permits us to apply. Thank you, Your Honor. Good morning, and may it please the Court. My name is Dustin Magumfar, and I represent the United States. With me at counsel table are Ann Lyons from EPA Region 9 and John Bryson and Kevin Pollencarz, counsel for the intervener. I will present argument for the first 15 minutes, and interveners will use the remaining five. Your Honors, today I will address three points. First, the College District does not have Article III standing, and this petition for review should be dismissed. Second, the College District's arguments under the Clean Air Act are without merit and must fail. EPA's action is consistent with its interpretation of the Act in place for more than 30 years. Third, there is no merit to the petitioner's argument under the Coastal Zone Management Act, and EPA met its obligations under that Act by providing the required notice of the application for a PSD permit to the local coastal management agency. EPA will rest on its briefs on the Auxiliary Boiler and Endangered Species Act issues unless the Court has questions. First, as to standing, it is the College District's burden to establish Article III standing. It has failed to do so here for four reasons. First, the College District cannot establish standing under the Doctrine of Parents Patrie. Second, it does not have associational standing. Third, it has not offered sufficient evidence of injury to its own interests. And fourth, there is no redressability for the claims that relief it seeks for its arguments under the Coastal Zone Management Act. First, Parents Patrie is a common law doctrine that permits a state to sue in limited circumstances to enforce the rights of its citizens. A state can't use this doctrine, however, to sue the United States. This is because the United States also represents the interests of its citizens, and the Supreme Court in Massachusetts v. Mellon recognized the United States as the grander parent. The same logic applies here. Even if the College District was authorized to represent its employees and students, it cannot represent those constituents and suit against the United States. So its claims based on the health and welfare of its students and employees do not give it standing to sue the United States in this action. Second, the College District does not have associational standing. In its reply brief, the College District essentially likened itself to a nonprofit environmental organization. This fails because the College District is not a member association. It does not have members, and so it cannot establish standing under this law. Individual employees and students, such as the two trustees who submitted declarations here, they may have standing, but that does not demonstrate that the College District itself has standing, and the College District is the only petitioner here. Does the declaration of Chancellor Kinnaman satisfy the injury requirement? No, Your Honor, and that was my next point. All of the evidence of injury that has been offered here to the College District's own interests is speculative. In the Chancellor's declaration, the College District makes one generic statement that air pollution results in higher facilities and maintenance costs, and they cite to a document published by EPA in 1976 for this proposition. But they offer no specific evidence that this natural gas power plant will impact this particular facility. They offer no studies, no evidence by engineers or other qualified experts, nothing but one unsubstantiated assertion. This is also true for its claims with respect to faculty recruitment and its revenue based on enrollment. They don't claim that any potential faculty member has actually turned down an offer of employment because of a power plant. That's nowhere in the declaration or any other evidence before this Court. And the same is true for students. They don't ever claim that any student has actually chosen not to attend the College District because of the power plant. And certainly, they have not offered any declarations from any potential faculty member or any potential student stating that they have declined to attend the College District because of the power plant. And again, in the Chancellor's declaration, they also touched on the health of its student-athletes, but this simply brings it back into the spectrum of parents patriae that cannot rely on that sort of representative interest on generalized concerns about health and welfare in a suit against the United States. So the College District has not offered real evidence of any concrete actual or imminent harm. Everything it has asserted is speculative, and thus it has not satisfied the injury in fact requirements under Article 3. Even if they could establish standing based on health and welfare concerns, which as I've explained, they cannot, the Air District that issued the permit here found that there would be no harm to any community as a result of a power plant. That's in the record. Moving now to redressability. Under the Coastal Zone Management Act, the relief that the College District has requested is for notice and public hearing from the San Francisco Bay Conservation and Development Commission. BCDC has stated in a letter that this Court has taken judicial notice of that it does not have jurisdiction in this matter and that it considers the matter to be closed. It's therefore speculative at best that a favorable decision from this Court will result in the relief requested. I'll touch on two other jurisdictional issues briefly. As the Court indicated earlier this morning, the Court does not have jurisdiction here in the petition for review of a federal PSD permit to review arguments implicating permitting decisions made by the Air District under state law. Further, and also as explained in EPA's brief, review of many of the College District's arguments, such as the construction moratorium, is barred by the Administrative Waiver Doctrine. In its reply brief, the College District fails to meet its burden of showing where in the record it raised the waiver arguments. Opposing counsel seems to, when asked about that, seems to point to the D.C. Circuit case in Alabama. What's your response to that? Alabama Power, essentially, Your Honor, as to the PM 2.5 issue in Alabama Power, what the College District wants is essentially what EPA attempted to do in the mid-1970s, which is apply the PSD regulatory program to pollutants for which the relevant area has been designated as nonattainment. The D.C. Circuit, in no uncertain terms in Alabama Power, said no. PSD, Section 165 of the Act, cannot apply to nonattainment pollutants. And so in response to that, EPA promulgated a regulatory exemption at 40 CFR 52.21I2 that says exactly that, that the PSD program does not apply to pollutants for which the relevant area is designated nonattainment. So Alabama Power doesn't stand for the, it does not help the College District in this position. It makes clear that what EPA did here in not applying PSD review to a pollutant for which the area is designated nonattainment is exactly correct. And that's been, that was the D.C. Circuit's decision in 1980, and that has been EPA's regulation and interpretation of the Act for more than the past 30 years. What happens now, and I don't know if you're the one to answer this or the other lawyer who's going to come up, but what happens now to 24-hour PM 2.5? Is there any recourse for the College District? So what happened in the specific regulatory context for this permit is, as Petitioner's Counsel stated, for much of the permitting process, the Bay Area was designated as attainment for PM 2.5 under the 24-hour standard and the annual standard. Once it was designated as nonattainment for the 24-hour standard, nonattainment new source review applies. Once an area is designated nonattainment for a particular permit, 24-hour PM 2.5 here, the local, the state, which here is the Bay Area Air Quality Management District, they have three years to revise their state implementation plan to address this new nonattainment designation and show how their regulatory program will bring the area back into attainment with that standard. During the three years before a SIP is due, there's an interim regulatory program called Appendix S, and Appendix S is what applies. The Air District analyzed the requirements of Appendix S during the permitting and said, Appendix S only controls, only regulates major sources, and a major source is one that is defined as emitting 100 tons per year or more of the specific pollutant. Here, the power plant doesn't emit 100 tons per year of PM 2.5, and so it's not subject to the regulatory controls in Appendix S. So what is it subject to? Well, the PSD permit here, because PM 2.5 is also regulated under the annual standard and the Bay Area is designated attainment for the annual standard, this PSD permit does have very strict limitations on emissions of PM 2.5 from this power plant, and even if the Bay Area were designated as attainment for 24-hour PM 2.5, that level would be the same. It's a determination of best available control technology. It's a highly technical determination made by the agency entitled to substantial deference, and it made that decision based on what the annual standard is. So there are, in fact, strict regulatory controls on emissions of PM 2.5 from this power plant. The only instance where is for 24-hour PM 2.5, there isn't any additional control under non-attainment standards because it's a minor source of the pollutant, and those sources aren't regulated until the state revises its state implementation plan, which is due in three years. Continuing with the PM 2.5 and the various challenges, there's been discussion this morning about Part A, various other challenges of the Clean Air Act, and it's important to remember that this is a petition for review of a federal PSD permit. A challenge to a PSD permit does not open the door to challenges under each and every part of the Clean Air Act. So under Part A, the obligations of a state implementation plan, if there's a concern here about whether the SIP is adequate, that's beyond the jurisdiction of the scope of this petition for review of a PSD permit. The same is true for all of the permitting decisions that the Air District would make under state law. Unless the Court has further questions on the Clean Air Act, I'll move to the Coastal Zone Management Act and address the issues there. The San Francisco Bay Conservation Development Commission, BCDC, they implement the NOAA-approved coastal management program for the San Francisco Bay Area. Projects that are in the coastal zone must show that they are consistent with the coastal management program before they receive a federal permit. This power plant is located outside of the coastal zone. BCDC does not automatically review projects that are outside of the coastal zone. They have a discretionary authority to request review of a project outside of the coastal zone if within 30 days of receiving notice of an application for a federal permit, such as a PSD permit here, they give notice to the applicants and the federal agency and request and receive permission from NOAA to conduct a consistency review. If they don't take that step within 30 days, then the opportunity is waived. EPA complied with its obligations under the Coastal Zone Management Act. It gave notice on two different occasions. It gave actual notice to BCDC of the PSD permit. BCDC chose not to seek discretionary review, and so after 30 days had passed from when it received notice, its opportunity to review the project is waived. That is where the inquiry under the CZMA ends. EPA did all it was required to do under the Act, and BCDC chose not to seek review. The argument about associated facilities, which is a highly technical and fact-specific provision of the Coastal Zone Management Act, is nothing more than an attempt to backdoor the power plant into the coastal zone and subject it to BCDC's review. The argument is without merit, as it fundamentally does not apply to the situation. PG&E, a separate company from Russell City, is reconductoring, which is to say upgrading, two transmission lines that currently exist within the coastal zone. The College District contends that the transmission lines are associated facilities. This is simply not the case. State coastal management review requires that an applicant controls all of a project, including its associated facilities, so that the applicant can ensure the project is consistent with the coastal management program and satisfy any demands or conditions imposed by the coastal management agency, here BCDC. NOAA, in its regulations, has stated that associated facilities are indispensable parts of a proposed federal action. So here, Russell City has no authority or control over PG&E's transmission lines. It has no authority or control or ability to change how PG&E is upgrading those emissions lines. As a result, it has no ability to satisfy any conditions that might be imposed on the reconductoring of the transmission lines as a result of coastal management review. Further, these power lines, which predate the power plant, they've been there for years, the upgrading of these power lines are not an indispensable part of the power plant, as NOAA has defined associated facilities. This is because the power lines are being upgraded for other reasons. It's to alleviate existing capacity issues. And these particular lines... Oops. These particular transmission lines are not essential. Other power lines could be used to transmit the power from the power plant. It could be spread over many lines, et cetera. The point is that upgrading these particular lines is not necessary to the operation of this plant. So the transmission lines are not indispensable parts. And since Russell City has no control over them and couldn't affect any mitigation measures that would be imposed on the reconductoring, they are not associated facilities. And further, the college district's interpretation of associated facilities would lead to absurd results. Under their interpretation, because a power plant generates power and transmission lines transmit power, a power plant in Kansas would be subject to coastal management consistency review because any transmission line anywhere on a transmission grid would be an associated facility of any power plant anywhere else on that grid. It simply makes no sense and it doesn't comport with the intent of the statute and the regulations that a project proponent be able to satisfy any conditions that are imposed on it. So in conclusion, with respect to the Coastal Zone Management Act, there is no standing because there's no redressability for their claims. The college district has the burden to demonstrate that EPA has acted arbitrarily or capriciously, and it has not done so. Its interpretation of the regulations defeat the very purpose of coastal review, and it leads to absurd results. EPA gave notice twice to BCDC, and that was all that was required. In closing, in this matter, the standard of review is highly deferential to the technical determinations of the agency. There is no jurisdiction here for the reasons I've outlined, and even if the court were to determine jurisdiction, there are no merits to any of the arguments. The Environmental Appeals Board was correct to deny review. Unless the court has any further questions, we ask that the petition be denied, and I will turn it over to counsel for the interveners. Thank you. Thank you. May it please the Court, my name is John Bryson. On behalf of Russell City Energy Company, and with me at the council table is Mr. Kevin Poloncarz on behalf of Russell City as well. Russell City Energy Project is well on the way to completion. It's been under construction for the last 18 months and is on target to be completed and be supplying electric power to the grid. Within a year, probably in May or June of next year. It was designed and certified as necessary to meet the pressing need for a supply of electric power to satisfy the public interest need in the San Francisco Bay Area. Right now there are over 400 craft employees on the site. There will be up to 600 by July. And as I said, it's on schedule. The primary argument here by the petitioners is based on the Clean Air Act. But their contention that the PSD permit conditions were required for the 24-hour PM 2.5 standard is nothing more than an assault on the longstanding federal state partnership that has been established by EPA over many decades for permitting under the Clean Air Act. The statute and the regulations are an integrated system for implementing the different programs under the Act. And these provisions explicitly recognize and respect the differences between the PSD permitting program, the new source review program for non-attainment areas, and the minor new source review permitting provisions. And as counsel for EPA has said, EPA has a very explicit regulation, 40 CFR 52.21I2, that says expressly that once an area goes into non-attainment for a pollutant, then the PSD provisions do not apply. And that implements the unequivocal ruling in Alabama Power by the D.C. Circuit back in 1980. Counsel for the petitioner here mistakenly relies on a different part of the decision in Alabama Power, which is interpreting Section 165E, which refers to monitoring provisions. Alabama Power rested its decision on 165A, which says expressly that the PSD permit program applies only in areas where that provision applies, that is, in attainment areas. So consequently, unable to respond to these definitive determinations of their argument, the petitioners have thrown up a lot of arguments based on other provisions of the statute and other regulatory requirements, but they have no merit, and many of them were not even preserved for review at all in this Court. In general, what they rely on extensively are provisions that implement the SIP provisions, Section 110A. And they have to be considered together with the requirement that the states have a SIP and that EPA review a SIP and the permitting requirements for PSD and new source attainment. And how EPA has done that is to say that if an area goes into nonattainment, then the state has to come and develop a SIP. But under its established regulations, that's something that can't be done overnight, and the state has to review it. So what happens during that sort of gap period? Well, in the gap period, EPA has addressed the gap period in its regulation, and in its longstanding regulation, which it applies here, is that in the gap period, major sources need to be controlled and will go through a process, but minor sources do not have to be. And EPA specifically considered this in conjunction with the implementation rule for PM 2.5 and has held and retained the 100 ton per year threshold. Essentially what the agency is saying is that there is a -- And these are minor sources? And this is a minor source. There's no doubt about that. And essentially what EPA is saying is that in this complex structure, there's always going to be a gap. It's very complicated. It certainly is. Sorry? I said it certainly is. It certainly is, and EPA's views of it are entitled to deference. Thank you, Mr. Grayson. You're welcome. Your time is up, but we'll give you two minutes. Thank you, Your Honor. Okay. I just want to point out the threat of injury is sufficient, and this is a procedural injury case, and we're very close in proximity to this case and have presented injury, concrete, and cause and fact. This PM 2.5 is major under the PSD regulations, and it's major under the non-attainment state implementation rules. It is minor under Appendix S by one ton. We're at the 99 ton rate. And this is a unique case because it was approved during the gap, and according to the Federal Register, irritated residents and the cases that I cited in the supplemental citations, the EPA does not have the ability or authority just to ignore a violation of the NAC, which here is the case. And so for this is a minor source, and they have a continuing obligation under Section 110 as the decisional law makes clear to regulate and to make sure that the total reductions are achievable through the plan to ensure achievement of the NAC. And that's why we cite the NRDC versus EPA case, because there they outline the findings that are necessary to make that. The construction moratorium we miss, again, by one ton. So we'd urge the Court that you have substantial basis as a matter of law to remand this permit back to the EPA for that analysis and to regulate this otherwise major source, which they have admitted they do not. You got the answer on the annual, not the 24-hour. Thank you, Your Honor. Thank you, Counsel. The case just argued will be submitted.
judges: Goodwin, Reinhardt, Murguia